No. 20-2039

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

SIERRA CLUB, CENTER FOR BIOLOGICAL DIVERSITY, WEST VIRGINIA RIVERS COALITION, WEST VIRGINIA HIGHLANDS CONSERVANCY, INDIAN CREEK WATERSHED ASSOCIATION, APPALACHIAN VOICES, and CHESAPEAKE CLIMATE ACTION NETWORK,
*Petitioners*

v.

UNITED STATES ARMY CORPS OF ENGINEERS; RYAN D. MCARTHY, in his official capacity as Secretary of the U.S. Army; LIEUTENANT GENERAL SCOTT A. SPELLMON, in his official capacity as U.S. Army Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers; MAJOR GENERAL ROBERT F. WHITTLE JR., in his official capacity as Division Commander of the U.S. Army Corps of Engineers, Great Lakes and Ohio River Division; COLONEL JASON A. EVERS, in his official capacity as District Commander of the U.S. Army Corps of Engineers, Huntington District, and THERESA SPAGNA, in her official capacity as Chief, North Branch, U.S. Army Corps of Engineers, Huntington District
*Respondents*

## PETITIONERS' MOTION FOR STAY PENDING REVIEW

DEREK O. TEANEY
APPALACHIAN MOUNTAIN ADVOCATES, INC.
Post Office Box 507
Lewisburg, West Virginia 24901
Telephone:  (304) 646-1182
E-Mail:      dteaney@appalmad.org
*Counsel for Petitioners*

# INTRODUCTION

Here we go again. In 2018, this Court told Respondent United States Army Corps of Engineers (the "Corps") "an individual [Section 404] permit will likely be necessary" for the Mountain Valley Pipeline (hereinafter, the "Pipeline"). *Sierra Club v. U.S.A.C.O.E.*, 909 F.3d 635, 655 (4th Cir. 2018). Nonetheless, on September 25, 2020, the Corps' Huntington District once more unlawfully verified that Mountain Valley Pipeline, LLC ("MVP"), is authorized to use the streamlined Clean Water Act ("CWA") permit known as Nationwide Permit ("NWP") 12. Ex. 1 (hereinafter, the "Verification"). As explained below, that action is unlawful because (1) the Corps failed to comply with the Endangered Species Act ("ESA") when it issued NWP 12 in 2017, and (2) the Corps' effort to remove a permit condition this Court determined MVP cannot satisfy was ineffective.

MVP intends to blast and trench through "critical" streams "as quickly as possible before anything is challenged."[1] Moreover, MVP maintains that it does not need the Federal Energy Regulatory Commission's approval to perform activities authorized under the verification. Ex. 2 at 2 n.8. Yet it requested permission from

---

1  Equitrans Midstream Corp. (ETRN) Q2 2020 Earnings Call Transcript (Aug. 4, 2020) (statement of Diana Charletta, President and C.O.O., Equitrans Midstream Corp.), *available at* https://www.fool.com/earnings/call-transcripts/2020/08/04/equitrans-midstream-corp-etrn-q2-2020-earnings-cal.aspx.

the Commission to resume construction activities—including stream crossing—by September 25, 2020. *Id.* at 5. Such authorization could come at any minute and without warning. MVP's haste necessitates this stay motion. The Corps and MVP oppose the motion.[2]

## BACKGROUND

The Corps permits fill material discharges under CWA Section 404 in two ways: through individual permits tailored to specific projects, or through general, nationwide permits. 33 U.S.C. §1344(a), (e)(1). Many NWPs require would-be-permittees to submit certain projects for "verification" using a pre-construction notification ("PCN")." 82 Fed. Reg. 1860, 1985 (Jan. 6, 2017).

An NWP's term cannot exceed five years. 33 U.S.C. §1344(e)(2). In January 2017, the Corps reissued its suite of NWPs. *See generally* 82 Fed. Reg. 1860. One of those permits, NWP 12, authorizes discharges related to utility lines, including natural gas pipelines. *Id.* at 1985. For projects like the Pipeline that require approval under the Rivers and Harbors Act, NWP 12 requires PCNs. *Id.* at 1986.

NWP 12's 2017 reissuance triggered ESA Section 7. The Corps erroneously maintains NWP 12's reissuance complied with that provision because, in its view,

---

2  On September 25, 2020, Petitioners asked the Corps to stay the Verification pending review. Ex. 3. The Corps refused. Ex. 4.

the "reissuance of an NWP ... results in 'no effect' to listed species or critical habitat[.]" Ex. 5 at 63-64.

NWP 12's reissuance also triggered CWA Section 401, which prohibits federal authorizations resulting in waterbody discharges without "certification" by the affected state that the discharges will comply with water quality standards. States can impose conditions through certifications, which become conditions of the federal permit. 33 U.S.C. §1341(d). The West Virginia Department of Environmental Protection ("WVDEP") certified NWP 12's reissuance under Section 401 in April 2017, subject to conditions to protect water quality. Those conditions became conditions of NWP 12 itself under 33 U.S.C. §1341(d). *Sierra Club*, 909 F.3d at 650.

In 2017 and 2018, the Corps issued verifications to MVP, concluding the Pipeline complied with NWP 12's terms and conditions. *Id.* at 641. On October 2, 2018, this Court vacated the Huntington District's verifications, *Sierra Club v. U.S.A.C.O.E.*, 905 F.3d 285 (4th Cir. 2018), holding that the conditions of West Virginia's Section 401 certification became conditions of NWP 12 by operation of law, that MVP could not satisfy two of those conditions, and that the Corps' efforts to excuse that noncompliance were unlawful. *Sierra Club*, 909 F.3d at 645, 650-51, 654-55. The conditions MVP could not satisfy are Special Condition A, which requires pipelines 36 inches or greater in diameter to possess an individual Section

401 water quality certification, and Special Condition C, which requires stream crossings to be completed within 72 hours. *Id.* at 640-41.[3] MVP still has no individual Section 401 certification.

After this Court vacated MVP's verification, WVDEP proposed to relax Special Condition A of its 2017 water quality certification so that MVP might satisfy it. Ex. 6.[4] WVDEP's proposed revision to Special Condition A would expand NWP 12's applicability to include pipelines in West Virginia equal to or greater than 36 inches in diameter or that cross a Section 10 river, even if those pipelines lack individual water quality certifications.[5] On April 24, 2019, WVDEP asked the Corps

---

3  The four stream crossings that implicated Special Condition C were the Gauley, Greenbrier, Elk, and Meadow Rivers crossings. *Sierra Club*, 909 F.3d at 642. As Petitioners currently understand the Verification, it does not authorize open-trench crossings of those rivers because MVP now intends to bore under three of those rivers and has already tunneled under the fourth. Ex. 7 at 5, 7. As a result, Special Condition C will not be discussed further in this motion.

4  Although WVDEP had proposed modifying its water quality certification's conditions at the time this Court decided *Sierra Club*, it subsequently issued a revised proposal in January 2019. 909 F.3d at 648 n.2; Ex. 6.

5  Revised Special Condition A provides, in relevant part:

    The Secretary of the West Virginia Department of Environmental Protection, in the Secretary's sole discretion, reserves the right to require an individual water quality certification for any of the following facilities or impacts:
    i.     Pipelines equal to or greater than 36 inches in diameter; [or]
    ii.    Pipelines crossing a Section 10 river ... [.]

to "incorporate this modification into its NWPs for West Virginia, in accordance with 40 C.F.R. §121.2(b)[.]" Ex. 8 at 1.

In two sets of comments submitted on June 27 and July 26, 2019, Petitioners informed the Corps that approving WVDEP's purported modification would be unlawful. Exs. 10 & 11. Nonetheless, on January 15, 2020, the Division Engineer for the Corps' Great Lakes and Ohio River Division purported to grant WVDEP's modification request. Ex. 12 at 1. Thereafter, on September 25, 2020, the Corps' Huntington District issued the Verification subject to this petition for review, expressly relying on the Division Engineer's unlawful modification of NWP 12's conditions. Ex. 7 at 26.

## STANDARD OF REVIEW

Four factors govern a stay pending review:

(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). In Natural Gas Act proceedings, this Court applies the Administrative Procedure Act. *Sierra Club*, 909 F.3d at 643. Under

---

Ex. 8 at 10-11. In contrast, Special Condition A as originally incorporated into NWP 12 provides, in relevant part, that "Individual Water Quality Certification *is required* for ... [p]ipelines equal to or greater than 36 inches in diameter ... [and] [p]ipelines crossing a Section 10 river ... ." Ex. 9 at 4 (emphasis added).

that standard, the Court must set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A).

## ARGUMENT

## I.     Petitioners Are Likely To Succeed On The Merits.

Petitioners are likely to succeed on the merits for two reasons. First, the Verification is unlawful because the Corps violated the ESA with its 2017 NWP 12 reissuance. *N. Plains Res. Council v. U.S.A.C.O.E.* ("*N.P.R.C.*"), ___ F.Supp.3d ___, 2020 WL 1875455 (D. Mont. 2020); *appeal filed*, No. 20-35412 (9th Cir.).[6] Second, the Verification is unlawful because it relies on a legally defective attempt to modify NWP 12's conditions.

### A. The Corps Violated the ESA With Its 2017 NWP 12 Reissuance.

In 2017, the Corps reissued NWP 12 without engaging in formal programmatic consultation with the federal wildlife services (hereinafter, the

---

6  If Petitioners' ESA arguments were to require a 60-day notice of intent ("NOI") under 16 U.S.C. §1540(g)(2)(A)(i), Petitioners would satisfy that requirement by reliance on the July 1, 2019 NOI sent to the Corps by Petitioners Sierra Club and Center for Biological Diversity. Ex. 13. That all of the Petitioners were not signatories to the July 1, 2019 NOI is of no import because the notice requirement is satisfied so long as one petitioner gives notice. *Citizens for a Better Env't-Calif. v. Union Oil Co. of Calif.*, 861 F.Supp. 889, 913 (N.D. Cal. 1994); *E.D.F. v. Tidwell*, 837 F.Supp. 1344, 1352-53 (E.D.N.C. 1992); *S.C. Wildlife Fed'n v. Alexander*, 457 F.Supp. 118, 123-24 (D.S.C. 1978).

"Services")—on the NWP program generally or NWP 12 specifically—to consider the cumulative impacts of NWP-authorized activities on protected species or their critical habitat. That failure—which stands in contrast to the Corps' 2007 and 2012 reissuances wherein it *did* conduct programmatic consultation with one of the Services—violates the ESA, as the federal district court in Montana recently held. *N.P.R.C.*, 2020 WL 1875455. Indeed, because of that legal defect, the Montana federal district court has declared NWP 12 unlawful and remanded it "to the Corps for compliance with the ESA." *Id.* at *8.[7] Accordingly, the Verification is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law. *See,*

---

7  The Montana district court initially remanded NWP 12 to the Corps, vacated the permit, and enjoined the Corps from authorizing any activities under it until consultation was complete. *N.P.R.C.*, 2020 WL 1875455, at *8. The Court subsequently narrowed the scope of the vacatur and the injunction to oil and gas pipelines, but left its remand order untouched. *Northern Plains Res. Council v. U.S.A.C.O.E.*, Civ. No. 19-44-GF-BMM, 2020 WL 3638125, at *14 (D. Mont. May 11, 2020). The Ninth Circuit denied emergency motions for a partial stay of the district court's orders on May 28, 2020, holding that the Corps had not "demonstrated a sufficient likelihood of success on the merits and probability of irreparable harm to warrant a stay pending appeal." Order, *N. Plains Res. Council v. U.S.A.C.O.E.*, No. 20-35412, Doc. 58 (9th Cir. May 28, 2020). The Supreme Court ultimately narrowed the scope of the district court's order to the Keystone XL pipeline. Order in Pending Case, *A.C.O.E. v. N. Plains Res. Council*, No. 19A1053 (U.S. July 6, 2020). The district court's declaratory judgment and remand order were unaffected by the appellate orders.

*e.g.*, *L.E.A.F. v. E.P.A.*, 118 F.3d 1467, 1473 (11th Cir. 1997) (reviewing substance of prior agency action in later as-applied challenge).

Under ESA Section 7(a)(2), the Corps has a duty to ensure any action it authorizes is not likely to jeopardize the continued existence of threatened or endangered species, or result in the destruction or adverse modification of critical habitat. 16 U.S.C. §1536(a)(2). The ESA's implementing regulations define the types of "action[s]" subject to this requirement to include "all activities *or programs* of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies." 50 C.F.R. §402.02 (emphasis added). Importantly, the Services have concluded the Corps' NWP program is a federal program subject to the programmatic consultation requirement. 80 Fed. Reg. 26,832, 26,835 (May 11, 2015).

Federal agencies cannot take actions that "may affect" listed species without first consulting with the Services under ESA Section 7(a)(2). 50 C.F.R. §402.14(a). For broad federal programs—like the Corps' nationwide permit program—action agencies and the Services must engage in "programmatic consultation" to consider the program's cumulative impacts and to guide implementation by establishing

criteria to avoid, minimize, or offset the program's adverse effects on listed species and critical habitat. *See id.* §§402.02, 402.14(i)(6); *see also* 80 Fed. Reg. at 26,837.

This is where the Corps violated the ESA in issuing NWP 12. *N.P.R.C.*, 2020 WL 1875455, at *7-8. NWP 12's reissuance was an action that "may affect" listed species, and thus was subject to the programmatic consultation requirements. *Id.*; *see also* 16 U.S.C. §1536(a)(2); 50 C.F.R. §§402.02 & 402.14(a); *N.P.R.C.*, 2020 WL 1875455, at *4; *N.W.F. v. Brownlee*, 402 F.Supp.2d 1, 9-11 (D.D.C. 2005).

The NWP 12 decision document establishes conclusively that NWP 12 "may affect" listed species and habitat. *N.P.R.C.*, 2020 WL 1875455, at *4-5. In that document, the Corps acknowledged

> [s]essile or slow-moving animals in the path of discharges, equipment, and building materials will be destroyed. Some aquatic animals may be smothered by the placement of fill material .... Activities that alter the riparian zone, especially floodplains, *may adversely affect populations of fish and other aquatic animals*, by altering stream flow, flooding patterns, and surface and groundwater hydrology.
>
> *****
>
> Activities authorized by this NWP *will result in adverse effects to other wildlife associated with aquatic ecosystems*, such as resident and transient mammals, birds, reptiles, and amphibians, through the destruction of aquatic habitat, including breeding and nesting areas, escape cover, travel corridors, and preferred food sources.

Ex. 5 at 76 (emphasis added).

"The ESA provides a low threshold for Section 7(a)(2) consultation[.]" *N.P.R.C.*, 2020 WL 1875455, at *5. Based on the foregoing, the Corps *knew* NWP

12 activities would certainly affect species of aquatic life and wildlife that depend on the waters of the United States, including any of the 1,666 species listed as endangered or threatened in the United States among them.[8] *N.P.R.C.*, 2020 WL 1875455, at *7. Indeed, the Corps has acknowledged that it conducts thousands of project-specific Section 7 consultations each year on NWP-authorized activities. 82 Fed. Reg. at 1873-74. Accordingly, the record for NWP 12 *by itself* establishes the permit "may affect" listed species and their critical habitat.

Despite its recognition of the devastating effects of NWP 12 activities on aquatic species, the Corps nonetheless concluded NWP 12 would have "no effect" on listed species and their habitat. Ex. 5 at 63-64. NOAA Fisheries—one of the expert agencies charged by Congress with implementing the ESA—disagreed with the Corps' proposed 2017 "no effect" determination and recommended the Corps initiate formal consultation on the 2017 NWPs. Ex. 14 at 4-5. NOAA Fisheries concluded, "[w]ithout a large-scale examination of the aggregate effects of the activities authorized by NWPs and the procedures established under the NWPs to address potential effects to listed species and critical habitat, we do not believe that

---

8  U.S. Fish & Wildlife Serv., Listed Species Summary (Boxscore), *available at* https://ecos.fws.gov/ecp0/reports/box-score-report.

the [Corps] can arrive at the conclusion that there is "no effect" from these NWPs on ESA-listed species or designated habitat." *Id.*

Against that backdrop, the Corps' final "no effect" conclusion and its refusal to engage in programmatic consultation is remarkable. Ex. 5 at 63-64. The Corps relied on the NWPs' General Condition 18 to justify its determination, which requires would-be-permittees to determine whether their activities might affect listed species and, if so, submit a PCN. *Id.* Based on that information, the Corps would initiate project-specific consultation "as appropriate." *Id.* at 64.

At least two federal courts have told the Corps its reliance on project-specific consultation under the general condition is inadequate to fulfill the agency's ESA duties and programmatic consultation is required. *N.P.R.C.*, 2020 WL 1875455, at *6; *Brownlee*, 402 F.Supp.2d at 9-11 ("[O]verall consultation for the NWPs is necessary to avoid piece-meal destruction of [species] habitat through failure to make a cumulative analysis for the program as a whole."). Project-specific consultation cannot cure the failure to conduct programmatic consultation. 50 C.F.R. §402.14(c)(4); *see also Lane Cty. Audubon Soc'y v. Jamison*, 958 F.2d 290, 294 (9th Cir. 1992); *Conner v. Burford*, 848 F.2d 1441, 1453-58 (9th Cir. 1988). That is particularly true with respect to the Corps' NWPs because NOAA Fisheries determined the NWP program *was* jeopardizing listed species in 2012. Ex. 15. Project-specific consultation, therefore, cannot relieve the Corps of its duty to

consult on the NWPs' issuance at the programmatic level, and cannot justify a "no effects" determination for NWP 12.

The problem with relying on project-specific consultation is it ignores the *cumulative* effects on listed species and critical habitat from the thousands of NWP projects conducted each year. *N.P.R.C.*, 2020 WL 1875455, at *7 ("Project level review, by itself, cannot ensure that the discharges authorized by NWP 12 will not jeopardize listed species or adversely modify critical habitat."). Programmatic consultation is the only way to ensure the piecemeal destruction of habitat from the thousands of activities authorized by NWPs each year will not cumulatively jeopardize listed species. For those reasons, NOAA Fisheries told the Corps in response to its proposed 2017 "no effects" determination that "individual activity-specific consultations ... cannot substitute for a broad-scale consultation on the NWPs overall." Ex. 14 at 33. The Corps' "no effect" determination did not address NOAA Fisheries' comments. Ex. 5 at 63-64. Instead, the Corps chose to refuse programmatic consultation until it was ordered to do so by the federal courts. Ex. 16.

If the Corps' position were correct, there would never be any programmatic consultations despite the Services' regulations, since all programmatic consultations also require project-specific review. The ESA regulations contemplate that programmatic consultation will assess how the program will track impacts to prevent

jeopardy to listed species and their habitat, and that subsequent project-specific consultation will authorize incidental take. 80 Fed. Reg. at 26,835-36. By skipping programmatic consultation, the Corps short-circuits the regulatory program and leaves the cumulative effect of thousands of NWP-authorized activities unassessed in violation of 50 C.F.R §402.14(c)(4), which provides that consultation on individual actions "does not relieve the Federal agency of the requirements for considering the effects of the action or actions as a whole."

The Corps' reliance on General Condition 18 also unlawfully delegates the Corps' ESA duties to permittees. *N.P.R.C.*, 2020 WL 1875455, at *7. The ESA requires the Corps to determine "at the earliest possible time" whether its actions "may affect listed species or critical habitat." 50 C.F.R. §402.14(a). By relying on project applicants to determine whether an activity might affect species or habitat, "General Condition 18 turns the ESA's initial effect determination over to non-federal permittees, even though the Corps must make that initial determination." *N.P.R.C.*, 202 WL 1875455, at *7. Such delegation is impermissible under the ESA. *Id.*

In short, the Corps' 2017 NWP 12 reissuance violated the ESA, and that defect fatally infects the Verification. Accordingly, Petitioners is likely to succeed on the merits.

**B.      The Verification Impermissibly Relies on Unlawful Modifications.**

To bypass *Sierra Club*, the Corps attempted to change the rules of the game by purporting to modify NWP 12's Special Condition A. That modification was unlawful for at least two reasons. First, the Division Engineer lacks the authority to modify NWP 12. Second, the Division Engineer abused whatever discretion he may have when he purported to modify NWP 12. Because the purported modification was *ultra vires*, it was ineffective to change NWP 12's conditions. *U.S. v. Cortez*, 930 F.3d 350, 357 (4th Cir. 2019) ("[B]ecause the power of administrative agencies ... is prescribed entirely by statute, *any* 'improper' agency action is 'ultra vires[.]'" (Emphasis original.)); *U.S. v. Smithfield Foods, Inc.*, 191 F.3d 516, 526 (4th Cir. 1999) (holding ineffective a purported permit modification that was legally defective). As a result, the Pipeline remains ineligible for NWP 12 because it cannot satisfy the permit's terms and conditions.[9]

**1.      The Division Engineer Lacks the Authority to Modify NWP 12's Conditions.**

The Division Engineer does not have the authority to incorporate the purported modification to Special Condition A into the Corps' 2017 NWPs. The

---

9   Specifically, because it lacks an individual Section 401 water quality certification from the State of West Virginia, MVP cannot satisfy Special Condition A. *Sierra Club*, 909 F.3d at 651-54.

chain of command is crucial within the Corps, and the purported modification violates that chain of command.

The CWA authorizes the Secretary of the Army, acting through the Chief of Engineers, to issue NWPs. 33 U.S.C. §§1344(d)-(e). The Chief Engineer has delegated some—*but not all*—of his NWP authority to Division and District Engineers. 33 C.F.R. §§330.1(d), 330.2(g), 330.4(e), 330.5.

The Division Engineer's discretionary authority regarding NWPs is expressly limited by §330.5(c) to modifying, suspending, or revoking "NWP authorizations." 33 C.F.R. §330.5(c); *see also id.* §330.1(d); §330.2(g); §330.4(e). *Authorizations* are distinct from the nationwide permits themselves. *Sierra Club*, 909 F.3d at 651. The Corps' regulations at 33 C.F.R. §330.2(c) provide, "*Authorization* means that specific activities that qualify for an NWP may proceed, provided that the terms and conditions of the NWP are met." In briefing before this Court in *Sierra Club*, the Corps conceded the discretionary authority discussed in 33 C.F.R. §330.5 "applies to the 'authorization,' not to the broader Nationwide Permit."[10] In other words, the Chief Engineer has delegated to the Division Engineer the authority to modify authorizations *only*; the Division Engineer cannot modify the broader NWP's terms and conditions. *Sierra Club*, 909 F.3d at 650 (recognizing the discretionary authority

---

10 Br. for the Federal Respondents at 23, *Sierra Club v. U.S.A.C.O.E.*, No. 18-1173(L) (4th Cir.), *cited in Sierra Club*, 909 F.3d at 651.

described in 33 C.F.R. §330.5(c) and (d) "specifically refer[s] to the Corps' ability to modify 'authorizations under an NWP' (Section 330.1(d)) and 'NWP authorizations' (Section 330.4(e))").

That distinction is crucial because, here, by operation of CWA Section 401(d), Special Condition A in WVDEP's 2017 Certification became a condition of the broader NWP 12, not a condition on *authorizations*. *See* 33 U.S.C. §1341(d) (providing state water quality certification conditions "shall become a condition on any Federal license or *permit*" (emphasis added)). This Court expressly held in *Sierra Club* that "state conditions *must* be conditions of the NWP." 909 F.3d at 645 (emphasis original).

Thus, only the Chief Engineer may modify the conditions of an existing NWP, as opposed to an authorization, and only in compliance with the procedures in 33 C.F.R. §330.5(b). And, as this Court held in *Sierra Club*, Special Condition A is a condition of the existing NWP 12. Accordingly, if the Corps wanted to grant WVDEP's request to modify Special Condition A, only the Chief Engineer could do so and only by reissuing NWP 12 anew by invoking and implementing the procedures set out in 33 C.F.R. §330.5(b) that require, *inter alia*, compliance with the National Environmental Policy Act and the CWA Section 404(b)(1) guidelines. 33 C.F.R. §330.5(b)(2)-(3).

Petitioners told all this to the Division Engineer. Ex. 11 at 4-7. But the Division Engineer purported to launder Special Condition A's requirement of an individual water quality certification from NWP 12 anyway. That action was unlawful because it was taken "without observance of procedure required by law" and without statutory or regulatory authority. 5 U.S.C. §706(2); *Cortez*, 930 F.3d at 357. That unlawful action in turn infects the Verification. *See L.E.A.F.*, 118 F.3d at 1473.

## 2. The Division Engineer Cannot Relax Conditions.

Even if the Division Engineer had discretion to modify NWP 12's Special Condition A, his action here would abuse that discretion. That is because the Corps' regulations—as interpreted by this Court in *Sierra Club*—unambiguously prohibit the Division Engineer from replacing Special Condition A with WVDEP's relaxed conditions.

In *Sierra Club*, this Court construed the discretionary authority delegated to Division and District Engineers to be a one-way ratchet, authorizing only modifications that make an NWP more restrictive and prohibiting modifications that would expand its applicability. 909 F.3d at 650-51. This Court expressly stated that the regulations limit the Division and District Engineers "to providing *additional* conditions, above and beyond those found in the NWP," such that "revised"

conditions can only be more stringent than the original condition. *Id*. at 650-51 (emphasis original).

The express limits on the Corps' discretionary authority imposed by 33 C.F.R. §330.1(d)—limiting modifications to those that "further condition or restrict"— conclusively demonstrate that "revised" conditions under 33 C.F.R. §330.4(e) can only be more stringent than the original condition, never less so. *Sierra Club*, 909 F.3d at 651. And the Corps itself has explained that the Division Engineer's discretionary action "can not expand a nationwide permit." 56 Fed. Reg. 59,110, 59,110 (Nov. 22, 1991).

As explained above, the purported modification to Special Condition A would expand NWP 12's applicability in West Virginia and make NWP 12 less restrictive. Indeed, the Corps acknowledges as much when it cites the purported modification as a basis for the Verification. Ex. 7 at 26. As a result, the purported modification is not the type the Division Engineer is authorized to make under 33 C.F.R. §330.5(c) because it would not "further condition or restrict" NWP 12, as required by 33 C.F.R. §330.1(d) and as held by this Court in *Sierra Club*, 909 F.3d at 650-51. Accordingly, the Division Engineer unlawfully accepted the modified Special Condition, and that unlawful act was void *ab initio*.

## II.     Petitioners Will Suffer Irreparable Harm.

Absent a stay, MVP will complete its unlawful stream and river crossings before resolution of this petition. MVP's operator announced in early August 2020 that MVP intends to trench through "critical" streams "as quickly as possible before anything is challenged."[11]  And MVP predicts it will be fully in service in early 2021. Ex. 17.

When it granted a stay the last time this controversy was before it, this Court necessarily concluded MVP's plans to trench and blast through the streams in its path would cause irreparable environmental harm. Order, *Sierra Club v. U.S.A.C.O.E.*, No. 18-1173(L), Docket No. 58 (4th Cir. June 22, 2018). That remains so today.

The Supreme Court holds environmental harms "by [their] very nature, can seldom be adequately remedied by money damages and [are] often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Vill. Of Gambell*, 480 U.S. 531, 545 (1987). The "dredging and filling of [waterbodies] that may occur while [a c]ourt decides [a] case cannot be undone." *Sierra Club v. U.S.A.C.O.E.*, 399

---

11 Equitrans Midstream Corp. (ETRN) Q2 2020 Earnings Call Transcript (Aug. 4, 2020) (statement of Diana Charletta, President and C.O.O., Equitrans Midstream Corp.),         *available         at*         https://www.fool.com/earnings/call-transcripts/2020/08/04/equitrans-midstream-corp-etrn-q2-2020-earnings-cal.aspx.

F.Supp.2d 1335, 1348 (M.D. Fla. 2005). And the Pipeline construction's lethal effect on aquatic life "is, by definition, irreparable." *Humane Soc'y v. Gutierrez*, 523 F.3d 990, 991 (9th Cir. 2008).

The Final Environmental Impact Statement for the Pipeline ("FEIS") identifies scores of stream-crossings in areas of shallow bedrock. Ex. 18 at AR006323-437. Expert geologist Pamela Dodds predicts blasting is likely in all areas "less than 10 feet to bedrock," (Ex. 19 at AR021905-06), which would include those stream crossings in shallow bedrock. Such blasting will cause irreparable harm to the streams and the life within them because of its lethal effects on aquatic organisms. Ex. 18 at AR005236.

One stream located in shallow bedrock—and therefore likely to be blasted— is TTWV-S-108, or the Narrows of Hans Creek. *Id.* at AR006396. Petitioners' members Herman and Paula Mann have recreated along and enjoyed the Narrows of Hans Creek at the proposed crossing location throughout their lives. Ex. 20, ¶¶9-12; Ex. 21, ¶¶13-19. In fact, Herman Mann used to own property on the Narrows of Hans Creek near the proposed Pipeline crossing. Ex. 20, ¶9. He recalls seeing an amazingly colorful fish in that stream in the 1960s, and he is now pretty sure what he saw was a candy darter (*id.*, ¶11)—an endangered species historically found in the Indian Creek watershed. Ex. 22 at 35. Mr. Mann would like to see candy darters

in the Narrows of Hans Creek again, but fears pipeline construction will make that impossible. Ex. 20, ¶11.

Mr. and Mrs. Mann also enjoy visiting Indian Creek—another stream that MVP will blast through under the Verification. *Id.*, ¶¶13-15; Ex. 21, ¶¶20-25. As with the Narrows of Hans Creek, the Indian Creek crossing is in an area of shallow bedrock and will, therefore, require blasting. Ex. 18 at AR006394; Ex. 19 at AR021905-06. The Pipeline threatens the aquatic life in Indian Creek that Mrs. Mann photographs, and would interfere with the reintroduction of endangered candy darters to Indian Creek. Ex. 21, ¶¶22-25.

The Manns' concerns about losing the opportunity to see candy darters in the Narrows of Hans Creek and Indian Creek if MVP is permitted to blast its way through those streams are well-founded. The candy darter was once found in the Indian Creek watershed, but has been extirpated. Ex. 22 at 35. The Fish and Wildlife Service, in its Species Status Assessment (SSA) Report for the Candy Darter, predicted that the Pipeline would degrade the habitat of the streams that it crossed, including those—like Indian Creek—"potentially suitable for future candy darter reintroduction." *Id.* at 39. Because "excessive sedimentation was a likely primary cause of the historical decline of the candy darter," the Mann's enjoyment of the species and its potential reintroduction to the Indian Creek watershed are threatened with irreparable harm. *Id.*

Finally, Pipeline completion threatens the Manns with irreparable harm from displacement. Ex. 20, ¶8; Ex. 21, ¶9. They will most likely move away from the farm on which Ms. Mann has lived her entire life because of its proximity to the Pipeline and the threats is poses to their lives and lifestyle. Ex. 20, ¶8; Ex. 21, ¶9. Such harm is permanent and irreparable.

## III. Preliminary Relief Will Not Substantially Harm the Corps or MVP.

Equitable relief would pose only minimal injury to the Corps. Although the Corps has interests in defending its permits, "the effect of an injunction on these interests seems rather inconsequential." *O.V.E.C. v. U.S.A.C.O.E.*, 528 F.Supp.2d 625, 632 (S.D.W.Va. 2007).

Moreover, MVP cannot object that a stay would cause it harm because, in the equitable analysis, harms caused by parties' failures to "avail[] themselves of opportunities to avoid the injuries" are not cognizable. *Di Biase v. SPX Corp.*, 872 F.3d 224, 235 (4th Cir. 2017). In *Sierra Club*, this Court informed MVP "an individual permit will likely be necessary" for the Pipeline. 909 F.3d at 655. Nevertheless, in the intervening two years MVP did not seek an individual permit. Rather, it persisted in pursuing NWP 12 authorization, notwithstanding the legal infirmities in the "fix" devised by the Corps and WVDEP. Having decided to risk continuing on the NWP 12 path, MVP cannot now claim the Court should protect it from the consequences of that choice.

Moreover, losing its NWP 12 verification will not cause substantial harm to MVP because its operator has publicly stated that, "[i]f for some reason there is another challenge ... with the Nationwide 12, then we can fall back to the options that we talked about, I believe last time, which are some different crossing methods and individual permit options."[12]

## IV.    The Public Interest Favors Preliminary Relief.

The "public has an interest in the integrity of the waters of the United States and in seeing that administrative agencies act within their statutory authorizations and abide by their own regulations." *O.V.E.C. v. Bulen*, 315 F.Supp.2d 821, 831 (S.D.W.Va. 2004). Ensuring Congressional mandates are carried out is always in the public interest. *See*, *e.g.*, *Johnson v. U.S.D.A.*, 734 F.2d 774, 788 (11th Cir. 1984). Finally, this Court necessarily concluded the public interest lies in a stay of the Pipeline's invalid NWP 12 authorization when it issued a stay the last time this controversy was before it. Order, *Sierra Club*, No. 18-1173(L), Docket No. 58.

### CONCLUSION

For the foregoing reasons, this Court should stay the Verification pending review.

_____

12 Equitrans Midstream Corp. (ETRN) Q2 2020 Earnings Call Transcript (Aug. 4, 2020) (statement of Diana Charletta, President and C.O.O., Equitrans Midstream Corp.), *available* *at* https://www.fool.com/earnings/call-transcripts/2020/08/04/equitrans-midstream-corp-etrn-q2-2020-earnings-cal.aspx.

Dated:  October 5, 2020

Respectfully submitted,

**/s/ Derek O. Teaney**
DEREK O. TEANEY
APPALACHIAN MOUNTAIN ADVOCATES, INC.
Post Office Box 507
Lewisburg, West Virginia 24901
Telephone:  (304) 646-1182
E-Mail:  *dteaney@appalmad.org*
*Counsel for Petitioners*

**CERTIFICATE OF COMPLIANCE WITH TYPE VOLUME LIMIT**

This motion complies with the type-volume limits because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments), this brief contains 5,198 words. This brief has been prepared in a proportionally spaced typeface using Microsoft Word for Mac 2019 in Times New Roman, 14 point.

/s/ Derek O. Teaney
DEREK O. TEANEY
APPALACHIAN MOUNTAIN ADVOCATES, INC.
P.O. Box 507
Lewisburg, WV 24901
Telephone:   (304) 646-1182
Email:        dteaney@appalmad.org

**CERTIFICATE OF SERVICE**

I hereby certify that, on October 5, 2020, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

/s/ Derek O. Teaney

DEREK O. TEANEY
APPALACHIAN MOUNTAIN ADVOCATES, INC.
P.O. Box 507
Lewisburg, WV 24901
Telephone:   (304) 646-1182
Email:        dteaney@appalmad.org
