No. 20-2039

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

SIERRA CLUB, CENTER FOR BIOLOGICAL DIVERSITY, WEST VIRGINIA
RIVERS COALITION, WEST VIRGINIA HIGHLANDS CONSERVANCY,
INDIAN CREEK WATERSHED ASSOCIATION, APPALACHIAN VOICES,
and CHESAPEAKE CLIMATE ACTION NETWORK,
*Petitioners*

v.

UNITED STATES ARMY CORPS OF ENGINEERS; RYAN D. MCARTHY, in
his official capacity as Secretary of the U.S. Army; LIEUTENANT GENERAL
SCOTT A. SPELLMON, in his official capacity as U.S. Army Chief of Engineers
and Commanding General of the U.S. Army Corps of Engineers; MAJOR
GENERAL ROBERT F. WHITTLE JR., in his official capacity as Division
Commander of the U.S. Army Corps of Engineers, Great Lakes and Ohio River
Division; COLONEL JASON A. EVERS, in his official capacity as District
Commander of the U.S. Army Corps of Engineers, Huntington District, and
THERESA SPAGNA, in her official capacity as Chief, North Branch, U.S. Army
Corps of Engineers, Huntington District
*Respondents*

**PETITIONERS' REPLY IN SUPPORT OF THEIR MOTION FOR STAY
PENDING REVIEW**

DEREK O. TEANEY
APPALACHIAN MOUNTAIN ADVOCATES, INC.
Post Office Box 507
Lewisburg, West Virginia 24901
Telephone: (304) 646-1182
E-Mail: dteaney@appalmad.org
*Counsel for Petitioners*

**INTRODUCTION**

The legal defects underlying the Huntington District's September 25, 2020 Nationwide Permit ("NWP") 12 verification (hereinafter, the "Verification"), the balance of equities, and the public interest all favor a stay of the Verification. The Pipeline's operator has committed to its shareholders that it will rush to complete "critical" stream crossings before this Court can stop it.[1] Indeed, as a result of the October 9, 2020 issuance of a Federal Energy Regulatory Commission ("FERC") order allowing Mountain Valley Pipeline, LLC ("MVP") to resume construction (Ex. 23), the need for a stay is even more urgent than it was when Petitioners filed their motion. With the issuance of that FERC approval, the only thing preventing MVP from trenching and blasting through streams is its voluntary commitment to this Court not to do so until Saturday October 17, 2020. Doc. #22 at 2. Consequently, Petitioners respectfully request that the Court grant their stay motion before October 17, 2020.

---

1   Equitrans Midstream Corp. (ETRN) Q2 2020 Earnings Call Transcript (Aug. 4, 2020) (statement of Diana Charletta, President and C.O.O., Equitrans Midstream Corp.), *available at* https://www.fool.com/earnings/call-transcripts/2020/08/04/equitrans-midstream-corp-etrn-q2-2020-earning-cal.aspx.

**ARGUMENT**

## I. Petitioners Are Likely To Succeed On The Merits.

Contrary to the assertions of the Corps and MVP, this Court has jurisdiction to consider Petitioners' merits argument. Moreover, the Corps and MVP are wrong to contend that NWP 12's 2017 reissuance met the substantive requirements of Section 7(a)(2) of the Endangered Species Act ("ESA"). And Special Condition A remains unaltered notwithstanding the assertion by the Corps and MVP that the Corps had to accept West Virginia's proposed revision.

### A. Petitioners Arguments Are Within This Court's Jurisdiction.

The contention by the Corps and MVP that this Court lacks jurisdiction over Petitioners' merits arguments is baseless. The Corps and MVP are correct that this Court's jurisdiction is prescribed by statute. *NETCOALITION v. S.E.C.*, 715 F.3d 342, 348 (D.C. Cir. 2013). But they are wrong that Petitioners' arguments lie outside the Court's statutory jurisdiction.

The Natural Gas Act ("NGA") grants this Court "original and civil jurisdiction over *any civil action* for the review of an order or action of a Federal agency (other than [FERC]) ... to *issue, condition*, or deny *any* permit, license, concurrence, or approval[.]" 15 U.S.C. §717r(d) (emphasis added). The Ninth Circuit has explained Section 717r(d)'s jurisdictional grant this way: "Congress contemplated that an order or action reviewable under §717r(d)(1) would be (1) a final agency action or order

(2) issuing, conditioning or denying (3) an agency determination (of a sort analogous to a permit) that has the legal effect of granting or denying permission to take some action." *Columbia Riverkeeper v. U.S. Coast Guard*, 761 F.3d 1084, 1093 (9th Cir. 2014).

This petition for review is a civil action seeking review of the Huntington District's Verification for MVP—a final agency action issuing the Corps' determination that MVP's stream crossings are authorized under NWP 12. The effect of the Verification is to authorize MVP to take certain actions necessary for the Pipeline's construction, including stream and wetland crossings. Accordingly, Petitioners' challenge to the Verification lies squarely within §717r(d)'s jurisdictional grant, and this Court has jurisdiction.

Petitioners ask this court to determine whether the Verification is lawful in light of the Corps' substantive violation of the Endangered Species Act ("ESA") and the Division Engineer's unauthorized attempt to modify an NWP 12 condition. Those questions are within the scope of this Court's jurisdiction. As this Court held in *Dow AgroSciences LLC v. N.M.F.S.*, "an exclusive judicial review provision applies to 'all issues inhering in the controversy.'" 637 F.3d 259, 265 (4th Cir. 2011) (quoting *City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320, 336 (1958)). Stated otherwise, if a challenge to a prior agency action "inheres in a challenge" to a final

agency action subject to an exclusive judicial review provision, then the prior agency action is reviewable under the judicial review provision. *Id.*

Issues inhering in an agency action include "'all objections to the order.'" *Id.* at 268 (quoting *Tacoma*, 357 U.S. at 336). Under *Dow*, inherent issues include the agency's reliance on prior agency decisions. *Id.* at 166–67. When it issued the Verification subject to this petition, the Corps unquestionably relied on (1) NWP 12 (a permit issued in violation of the Corps' substantive ESA obligation to ensure that its actions do not jeopardize listed species or their habitat) and (2) the January 2020 ineffective attempt to modify Special Condition A. Because that reliance inheres in the Verification under *Dow*, §717r(d) grants this Court jurisdiction to review it.

The Corps' position to the contrary is one of convenience, not principle. The Corps knows that issues surrounding NWP 12's promulgation inhere in the issuance of a verification under that permit. That is why the Corps included the administrative record for the promulgation of *all* of the NWPs in its record for review of MVP's prior Huntington District verifications. Notice of Filing of the Certified Index to the Administrative Record, *Sierra Club v. U.S.A.C.O.E.*, No. 18-1173, Doc. #39 (4th Cir. Apr. 27, 2018).

Moreover, although here the Corps insists that Petitioners must raise their ESA argument in a district court, just six weeks ago, the Corps took the opposite position at the United States Court of Appeals for the Ninth Circuit. In its appeal of

the federal district court decision declaring NWP 12 unlawful and remanding it for compliance with the ESA, the Corps told the Ninth Circuit that federal district courts do not have jurisdiction to grant relief affecting natural gas pipelines because the NGA grants jurisdiction to the appellate courts. Federal Appellants Br. at 50, *N. Plains Res. Council v. U.S.A.C.O.E.*, No. 20-35412(L), Doc. #70 (9th Cir. Aug. 26, 2020).

Likewise, in 2009, the Corps persuaded a federal district court to dismiss challenges to an NWP 12 approval for a natural gas pipeline under the ESA and the Clean Water Act ("CWA") for the same reason. *Palm Beach Cty. Envtl. Coal. v. Fla.*, 651 F.Supp.2d 1328, 1340-46 (S.D. Fla. 2009). The Corps argued that even though the plaintiffs' claims relating to the Corps' issuance of permits for the pipeline at issue were "brought under [the] ESA[] and the CWA/[Rivers and Harbors Act], the NGA controls with respect to determining jurisdiction." *Id.* at 1342. The district court accepted the Corps' jurisdictional argument and dismissed the ESA and CWA claims, holding that §717r(d)(1) "does not prevent the Court of Appeals from considering Plaintiffs' claims within the context in which they were brought, namely, under ... the ESA[ and] the CWA[.]" *Id.* at 1346. The district court was persuaded that the language of §717r(d) creating appellate jurisdiction over "any civil action," without any qualifying language, was broad enough to allow review of

ESA and CWA claims in the context of a challenge to the issuance of a permit for a natural gas pipeline. *Id.* at 1345-46.

The same applies here, yet the Corps asserts the exact opposite in a hollow attempt to undermine this Court's clear jurisdiction. Considering the Corps' contradictory positions, it appears the Corps is simply trying to avoid judicial scrutiny of its actions. Indeed, three times in its brief (at 2, 9, and 12) the Corps suggests that judicial review is not available at all. That cannot be the law. *Dow*, 637 F.3d at 267 (noting the "strong presumption that Congress intends to allow for judicial review of final agency actions"). As shown above, Petitioners' ESA and permit modification arguments inhere in their challenge to the Verification, rendering them fodder for this §717r(d) petition for review.

Petitioners do not rely on *L.E.A.F. v. E.P.A.*, 118 F.3d 1467 (11th Cir. 1997), out of some mistaken impression that this is a statute of limitations case as the Corps and MVP imply. Rather, Petitioners cite *L.E.A.F.* for the proposition that unlawful agency actions are "void *ab initio*" and cannot serve as the basis for a later agency action. *Id.* at 1473. *See also Dixon v. U.S.*, 381 U.S. 68, 74 (1965) (unlawful agency actions are nullities); *U.S. v. Cortez*, 930 F.3d 350, 357 (4th Cir. 2019) ("[B]ecause the power of administrative agencies ... is prescribed entirely by statute, *any* 'improper' agency action is 'ultra vires[.]'" (Emphasis original.)); *Thomas v. Lukens*, 259 F. 543, 545 (4th Cir. 1919) (holding that *ultra vires* act by executive branch

— 6 —

official is void *ab initio*). Because the unlawfully issued NWP 12 and the ineffective attempt to modify one of its conditions are the keystones of the Verification, this Court is free to examine their legal defects in reviewing the Verification.

The Corps' NWPs are legislative rules, *N.A.H.B. v. U.S.A.C.O.E.*, 417 F.3d 1272, 1285-86 (D.C. Cir. 2005), and substantive assaults on rules are fair game in challenges to their application. *L.E.A.F.*, 118 F.3d at 1473; *see also Pub. Citizen v. N.R.C.*, 901 F.2d 147, 152-53 (D.C. Cir. 1990) ("[A]gencies have an everpresent duty to insure that their actions are lawful."). Contrary to the contentions of the Corps and MVP, Petitioners' arguments are not procedural. (We are not arguing about public notice and comment here.) Rather, Petitioners' argument that the Corps violated ESA Section 7(a)(2) when it issued NWP 12 is a *substantive* claim that bears on the lawfulness of the Verification. *E.P.I.C. v. Simpson Timber Co.*, 255 F.3d 1073, 1078-79 (9th Cir. 2001) (citing *Bennett v. Spear*, 520 U.S. 154, 173 (1997)). Likewise, Petitioners' argument that the Division Engineer did not have statutory or regulatory authority to modify Special Condition A is substantive as well. *L.E.A.F.*, 118 F.3d at 1473; *Pa. Dept. Of Public Welfare v. U.S.D.H.H.S.*, 101 F.3d 939, 944-45 (3d Cir. 1996) (reviewing substantive as-applied argument that application of rule was inconsistent with internal regulations).

In sum, the focus of this petition is a project subject to the NGA. If the stay motion, and ultimately this petition, are granted, the result will directly affect the

Verification only—not NWP 12 or the Division Engineer's unlawful modification attempt. In this NGA proceeding, the Court can review whether the Verification was issued in accordance with law under the APA (*Sierra Club v. U.S.A.C.O.E.*, 909 F.3d 635, 643 (4th Cir. 2018)), and that includes whether the foundation inhering in the Verification was solid. Such review and result are consistent with §717r(d) and this Court's decision in *Dow*, 637 F.3d at 266-67.

## B. The Corps Violated the ESA With Its 2017 NWP 12 Reissuance.

As the Supreme Court has observed, "[o]ne would be hard pressed to find a statutory provision whose terms were any plainer than those in § 7" of the ESA. *T.V.A. v. Hill*, 437 U.S. 153, 173 (1978). It states that "[e]ach Federal agency shall, in consultation with and with the assistance of [the federal wildlife services], insure that any action authorized, funded, or carried out by such agency [] is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification" of designated critical habitat. 16 U.S.C. §1536(a)(2). This "mandate applies to *every discretionary agency action*—regardless of the expense or burden its application might impose." *N.A.H.B. v. Defs. of Wildlife*, 551 U.S. 644, 671 (2007) (emphasis added).

Nonetheless, the Corps violated Section 7's mandate to ensure its actions do not jeopardize listed species and their habitat when it refused to conduct programmatic consultation on NWP 12. As a result, the Montana federal district

court declared NWP 12 unlawful and remanded it "to the Corps for compliance with the ESA." *N. Plains Res. Council v. U.S.A.C.O.E.* ("*N.P.R.C.*"), 454 F.Supp.3d 985, 996 (D. Mont. 2020). That same reasoning should control here, and the Corps cannot rely on an unlawful permit to approve this project.

The Corps (at 5) suggests that the Supreme Court's issuance of a *partial* stay of the district court's relief suggests that the merits of the *N.P.R.C.* ruling "is not likely to survive appellate review." MVP is more measured (at 14 n.5), reading the tea leaves of the Supreme Court's order to "suggest[] at least a 'fair prospect' that the [district] court's judgment will be reversed." What the Corps and MVP ignore is that the Supreme Court *denied* the stay motion and left in place the district court's vacatur and injunction as to the pipeline at issue in that case, Keystone XL. Corps Ex. A. Properly understood, the Supreme Court's order reflects its concern with the scope of *relief* in *N.P.R.C.*, rather than with the *merits*.

On those merits, the Corps and MVP contend that the Corps' 2018 "no effect" determination is conclusive on whether the Corps should have engaged in programmatic consultation to ensure that NWP 12 does not jeopardize listed species or their habitat. But the Corps' "no effect" determination is not the end of the matter. Because NWP 12, as a whole, "may affect" listed species or their habitat (as the Montana district court determined), programmatic consultation was required.

Rather than being a reasoned agency conclusion, the Corps' "no effect" determination was a strategic choice, designed to delay programmatic consultation until it got caught violating Section 7(a)(2). As the Montana federal district court observed, in 2017 "the Corps' own regulatory manager acknowledged the Corps' consultation obligations before recommending that the Corps simply make a 'national "no effect" determination for each NWP reissuance until it is challenged in federal court and a judge rules against the Corps.'" *N. Plains Res. Council v. U.S.A.C.O.E.*, ___ F.3d ___, 2020 WL 3638125, at *10 (D. Mont. May 11, 2020); *see also* Ex. 16. The Corps knowingly rolled the die, and a "Court ruled against the Corps, just as the Corps anticipated." *N. Plains Res. Council*, 2020 WL 3638125, at *10.

There can be no doubt that programmatic consultation was required for the NWP 12's 2017 reissuance. The ESA's "may affect" threshold for triggering Section 7's consultation requirement is a low one. *Cal. ex rel. Lockyer v. U.S.D.A.*, 575 F.3d 999, 1018 (9th Cir. 2009). "'*Any possible effect*, whether beneficial, benign, adverse, or of an undetermined character triggers the formal consultation requirement[.]'" *Id.* (quoting 51 Fed. Reg. 19,926, 19,949 (June 3, 1986); emphasis in *Lockyer*). The NWP 12 decision document alone establishes that the permit meets that threshold. *N.P.R.C.*, 454 F.Supp.3d at 991; *see also* Ex. 5 at 76. So does NMFS's 2012 jeopardy determination. Ex. 15. And the fact that the Corps conducts thousands of project-

specific Section 7 consultations each year on NWP-authorized activities corroborates that conclusion. 82 Fed. Reg. 1860, 1873-74 (Jan. 6, 2017). Moreover, the Fish and Wildlife Service ("FWS") has concluded at least twice that stream crossings using cofferdams—like the ones authorized by the Verification—are likely to adversely affect endangered Roanoke logperch. Ex. 24, app. B, tbl. 2; Ex. 25, at 39 & app. B, tbl. 3. There is simply no question that NWP 12 "may affect" listed species and their habitat.

The Corps insists that project-specific consultation under General Condition 18 eliminates the need for programmatic consultation and that project-specific cumulative effects analyses are a sufficient proxy for the programmatic consultation it refuses to conduct. The Corps is wrong. The cumulative effects analysis in a project-specific review is narrowly limited to a project's "action area," 50 C.F.R. §402.02, and therefore does not consider the cumulative effects *of the program itself*.

For example, project-level reviews under NWP 12 ignore cumulative impacts to species, such as migratory birds, that travel through multiple project areas. And such reviews do not even ensure that an analysis of the *cumulative* impacts of projects in the same geographical vicinity will occur. The Mountain Valley and Atlantic Coast Pipelines are particularly illustrative on this point, notwithstanding that the Atlantic Coast Pipeline has been cancelled. Both pipelines proposed to traverse endangered Roanoke logperch habitat. Ex. 24 at 1; Ex. 25 at 1. Mountain

Valley Pipeline will adversely affect three of the eight remaining Roanoke logperch populations; Atlantic Coast Pipeline would have affected a fourth. *Compare* Ex. 26 at 10 *with* Ex. 24 at 68-72 & Ex. 25 at 18-19. Nonetheless, the project-specific analysis for each pipeline ignored the adverse effect of the other when assessing jeopardy. Ex. 25 at 19; Ex. 27 at 14. Myopic project-specific consultations may therefore wrongly conclude that effects on imperiled species such as logperch are acceptable precisely because they fail to account for the combined effect of the NWP 12 program on the species. For that reason, the Ninth Circuit has concluded that "project-specific consultations do not include ... analysis comparable in scope and scale to consultation at the programmatic level." *Cottonwood Envtl. Law Ctr. v. U.S.F.S.*, 789 F.3d 1075, 1082 (9th Cir. 2015).

More fundamentally, however, the Corps' argument contravenes the purpose of programmatic consultation, which includes an assessment of how a federal program operates in order to formulate data collection, analysis, and reporting requirements to ensure the program does not jeopardize species. Indeed, the Corps itself has acknowledged that programmatic consultation provides "tools that districts can use to better address potential impacts to endangered and threatened species." 72 Fed. Reg. 11,092, 11,096 (March 12, 2007). By skipping programmatic consultation in 2017, the Corps failed to ensure that its NWP program has the data-

collection and reporting tools necessary to avoid jeopardizing listed species and their habitat.

The Corps asserts (at 15) that Petitioners' reliance on comments by the National Marine Fisheries Service ("NMFS") on the 2017 "no effect" determination distorts the record. The Corps further implies (at 15) that NMFS was satisfied that its concerns were addressed. In making those contentions, the Corps relies on internal correspondence and a letter it sent to NMFS. Corps' Ex. G-J. But nothing in those documents establishes that NMFS agreed with the Corps' "no effect" determination.

Instead the record shows that NMFS was unequivocal in its objection to the Corps' "no effect" determination, stating that it "cannot support [the determination's] inclusion in the preamble of [the Corps' proposal to reissue NWP 12 in 2017]," and that "such a conclusion is not supportable under the ESA." Ex. 28 at NWP027611. NMFS further stated that it is "concerned that the [Corps'] failure to consult on the effects of this rule pursuant to Section 7(a)(2) of the ESA is not consistent with the [Corps'] legal obligations." *Id.* Nothing in the record indicates that NMFS ever changed its mind on that point.

Finally, in a footnote (at 13 n.4), the Corps tries to explain how General Condition 18 does not result in an impermissible delegation of its duty to determine whether its NWP program may affect listed species and their habitat. The Corps

raises the prospect of criminal penalties for permittees who fail to comply with General Condition 18. Setting aside probabilities of detection of such law breaking, if the Corps remains unaware that it is occurring because no notice was given, then no consultation would occur. That alone violates the ESA.

### C. Neither the CWA Nor The Corps' Regulations Required Or Permitted the Division Engineer to Modify Special Condition A.

In their arguments in support of the Division Engineer's unlawful and ineffective modification of Special Condition A, the Corps and MVP intentionally conflate the initial conditioning of a 401 certification—which cannot be altered or rejected under 33 U.S.C. §1341(d)—with a later attempt by the state to modify its certification conditions—which is not permissible at all.

The Corps (at 17-18) and MVP (at 16-18) invoke a regulation in support of the modification on which the Division Engineer himself did not purport to rely: 33 C.F.R. §330.4(c)(2). That regulation provides, in part:

> If, *prior to the issuance or reissuance of such NWPs*, a state issues a 401 water quality certification which includes special conditions the division engineer will make these special conditions regional conditions of the NWP for activities which may result in a discharge into waters of the United States in that case.

(Emphasis added.). Although the Division Engineer only mentioned that regulation once in his rationale for his modification of Special Condition A (and only in a description of the regulatory backdrop, *see generally* MVP Ex. 3), MVP and the Corps assert that §330.4(c) and this Court's opinion in *Sierra Club* combine to

*require* the Division Engineer to modify Special Condition A. That *post-hoc* rationalization is flatly wrong.

The plain language of 33 C.F.R. §330.4(d) makes clear that it applies only when a state's 401 certification is issued "prior to the issuance or reissuance of [the] NWPs." Because West Virginia attempted to modify Special Condition A two years after the Corps included Special Condition A in NWP 12, the regulation cannot support the Division Engineer's attempted modification.[2]

That §330.4(c)(2) is limited to a state's initial 401 certification makes sense. CWA Section 401(d) provides that any condition in a state certification "shall become a condition on any Federal license or permit." 33 U.S.C. §1341(d). This Court—like all the federal circuit courts to address the question—has held that federal agencies must take initial 401 certification conditions as they come, unaltered. *Sierra Club*, 909 F.3d at 645-46.

---

2 MVP insinuates (at 19) that, if §330.4(c)(2) limits the Division Engineer's mandate regarding 401 certification conditions to those received prior to permit reissuance, then Special Condition A and C may never have become conditions of NWP 12. If MVP had any confidence at all in that argument, it would have raised it two-and-a-half years ago.

Regardless, as established by Exhibit 9 to the stay motion, the Division Engineer made Special Conditions A and C conditions of NWP 12—either under §330.4(c)(2) or §330.5(c)—and could not thereafter weaken them because of 33 C.F.R. §330.1(d).

MVP argues (at 16), however, that Section 401(d) similarly mandates that the Corps give effect to West Virginia's modified Special Condition A. And the Corps contends (at 17) that it had to accept the modification under "this Court's directive." But there is no such mandate in 33 U.S.C. §1341(d) or directive in *Sierra Club*. Indeed, CWA §401 expressly limits a state's certification authority to a one-year period. 33 U.S.C. §1341(a)(1). For that reason, the Environmental Protection Agency ("EPA") recently repealed its regulation allowing the modification of section 401 certifications (a regulation on which the Corps relied when it attempted to modify Special Condition A), explaining

> **section 401 does not provide certifying authorities with the authority to modify certifications after they are issued**. ... As a general matter, administrative agencies possess the inherent authority to reconsider prior decisions;[] however, section 401 provides express statutory language (e.g., specifying the time period in which a certifying authority must act on a certification request or waive its right to act; requiring certification conditions to be incorporated into a separate federal permit) that displaces the general principle and thus **Congress has precluded the certifying authority from reconsidering or modifying a certification.**

85 Fed. Reg. 42,210, 42,280 (July 13, 2020) (emphasis added; internal footnote omitted).[3]

---

3   In any event, the now-repealed regulation, by its own terms, did not *require* the Corps to accept West Virginia's proposed modification; rather it granted the Corps the discretion to accept it. 40 C.F.R. §121.2(b) (2019). Indeed, in its response to comments on the modification to Special Condition A, the Corps expressly rejected any contention that it was required to accept the revision because it recognized the discretion afforded by the now-repealed regulation. Ex.

For the Corps and MVP, the *source* of the revision to Special Condition A is the whole ballgame. Throughout their response briefs they emphasize that the Corps was empowered—if not required—to water down Special Condition A simply because West Virginia asked it to. Doc. # 26 at 16-20; Doc. #28 at 16-19. And they both try to distinguish run-of-the-mill "Corps regional conditions" from "water quality certification regional conditions," asserting that the scope of the Division Engineer's authority turns on that distinction. Doc. # 26 at 19, Doc. #28 at 17. But the *source* of a proposed modification becomes irrelevant *after* a state's water quality certification conditions have been incorporated into an NWP by operation of 33 U.S.C. §1341(d). That is because Section 401 does not permit a state to modify its certification conditions thereafter.

Consequently, it does not matter that West Virginia was the proponent of the revision to Special Condition A. The Division Engineer, therefore, was not authorized to treat the revision any differently from any other modification. As explained in Petitioners' stay motion, because Special Condition A became a condition of NWP 12 itself by operation of CWA §401(d), only the Chief of Engineers could modify it under Corps regulations. Doc. #20 at 14-18. And even if

---

29 at 8. As a result, even if the now-repealed regulation were the controlling law, it would not mandate acceptance of West Virginia's revision and the Corps' default modification rules would apply. As explained in the stay motion, those rules prohibited the Division Engineer from accepting the proposed revision. Doc. #20 at 14-18.

the Division Engineer could modify Special Condition A, he could only make it more stringent using his discretionary authority under 33 C.F.R. §330.5(c) and §330.1(d). The Division Engineer lacked the authority to modify Special Condition A to make it less stringent, and his attempt to do so was void *ab initio*. Consequently, the original Special Condition A remains a condition of NWP 12, and because MVP cannot satisfy it, the Verification is unlawful.

## II.     Petitioners Will Suffer Irreparable Harm.

In their irreparable harm argument, the Corps and MVP entirely ignore the irreparable harm that Petitioners' members Paula and Herman Mann face from *displacement* resulting from Pipeline construction. Ms. Mann and her husband live on the same farm on which she was born nearly 70 years ago, which neighbors a property on which the Pipeline would be built. Ex. 21. ¶¶1, 6. The Manns maintain an organic farm on their property. *Id.*, ¶8. Ms. Mann avers that,

> [i]f construction of the ... Pipeline is completed and the pipeline is
> placed into operation, I will most likely move away from this farm on
> which I have spent my entire life. I believe my home is in the blast zone
> from the pipeline, and I am gravely concerned about the risk of a leak
> or catastrophic explosion. I would rather feel safe and would therefor
> make the sacrifice of owning this family farm.

*Id.*, ¶9; *see also* Herman Mann Decl., Ex. 20, ¶ 8 ("The presence of the pipeline nearby is just a constant worry. If the pipeline is place into operation, I will most

likely move from this farm because of my concerns about leaks or catastrophic explosion."). Those harms to the Manns are irreparable, not temporary.

Moreover, the Corps' and MVP's position that clearing streambanks of all vegetation, dewatering streambeds, and then blasting a deep trench through those streambeds using explosives would not cause irreparable environmental harm is untenable and contradicted by the September 4, 2020 Biological Opinion ("BiOp"). In that document, the FWS observes that blasting has already been "required along approximately 153 miles of the MVP corridor[.]" Ex. 24 at 20. FWS also concludes that trenching through streams and its attendant blasting will kill endangered candy darters. *Id.*, App. B, tbl. 3; *see also* Ex. 25 at 39 (FWS conclusion that blasting through streams for the Atlantic Coast Pipeline would kill Roanoke logperch). Those lethal effects on endangered fish are "by definition, irreparable." *Humane Soc'y v. Gutierrez*, 523 F.3d 990, 991 (9th Cir. 2008).

The Corps (at 20) points to "increased oversight and enhanced erosion and sediment ["E&S"] controls" to support its contention that stream crossings will be harmless. But that contention is belied by FWS's conclusion in the BiOp that, "[d]espite the E&S control measures, ... there have been **and will be** erosion and increased sedimentation **from wetland/stream crossings**[.]" Ex. 24 at 117

(emphasis added). And state regulators have had to cite MVP for ineffective environmental protection measures at stream crossings.[4]

Finally, regarding candy darter reintroduction, as recently as July 2020, Indian Creek remained a "candidate for candy darter reintroduction." Ex. 30, ¶6. Indeed, Petitioner Indian Creek Watershed Association may collaborate with FWS on that project. *Id.*, ¶4.

## III. The Balance of the Equities Favors A Stay.

MVP makes the remarkable contention (at 22) that Petitioners have unreasonably delayed seeking judicial relief. Considering that Petitioners filed this petition on the first business day after the Verification issued and this stay motion within 10 days of its issuance, MVP's position is meritless.

MVP also complains (at 23) about the possible financial impact of a stay. But MVP faces the prospect of financial costs from another stay of its NWP 12 verification because it stubbornly refused to seek an individual Section 404 permit for the Pipeline—even after this Court told it that it would likely need one. *Sierra Club*, 909 F.3d at 655. MVP has gone "all in" on NWP 12. It cannot now complain that its wager was costly. *Di Biase v. SPX Corp.*, 872 F.3d 224, 235 (4th Cir. 2017).

---

4 *See* Consent Order Issued Under the West Virginia Water Pollution Control Act 10, 23 (Apr. 19, 2019), https://bit.ly/2LNgvxF.

In any event, irreparable environmental injury outweighs economic harm in the balance of equities. *See, e.g.*, *Sierra Club v. U.S.A.C.O.E.*, 645 F.3d 978, 996-97 (8th Cir. 2011). "Money can be earned, lost, and earned again;" a pipeline trench, blasted through a stream, is forever. *O.V.E.C. v. U.S.A.C.O.E.*, 528 F.Supp.2d 625, 632 (S.D. W. Va. 2007).

IV.    **The Public Interest Lies in a Stay.**

The Corps (at 21) and MVP (at 23) argue that natural gas projects serve the public interest. But, by its own terms, the NGA yields to the Clean Water Act. 15 U.S.C. §717b(D). The NGA thus reflects a Congressional determination that, however important gas infrastructure is, it must be developed in compliance with the CWA and other environmental statutes.

MVP insists that rapid completion of the Pipeline is in the public interest because of a delay's effect on landowners, and it points to statements from eight landowners to support that contention. MVP Ex. 7. But a review of the FERC docket quickly reveals at least an equal number of affected landowners—and thousands of concerned citizens—that oppose completion of the Pipeline. *See, e.g.*, Ex. 31.

Allowing MVP to resume trenching and blasting through West Virginia's streams notwithstanding its failure to comply with federal law, no matter the effects on the environment and private property rights, is not in the public interest. At bottom, through their public interest arguments, MVP and the Corps invite this Court

to cast aside the rule of law in favor of the pursuit of private profit. The Court should deny that invitation, "lest this country cease to be a nation of laws." *Al-Marri v. Pucciarelli*, 534 F.3d 213, 218 (4th Cir. 2008) (Motz, J., concurring); *vacated sub nom. Al-Marri v. Spagone*, 555 U.S. 1220 (2009); *see also U.S. v. Medley*, 972 F.3d 399, 418 (4th Cir. 2020) ("What gives people confidence in our justice system is not that we merely get things right. ... Rather, it is that we live in a system that upholds the rule of law even when it is inconvenient to do so.").

## CONCLUSION

For the foregoing reasons, this Court should stay the Verification pending review.

Dated:  October 12, 2020                    Respectfully submitted,

/s/ Derek O. Teaney

DEREK O. TEANEY
APPALACHIAN MOUNTAIN ADVOCATES, INC.
Post Office Box 507
Lewisburg, West Virginia 24901
Telephone:    (304) 646-1182
E-Mail:        *dteaney@appalmad.org*
*Counsel for Petitioners*

## CERTIFICATE OF COMPLIANCE WITH TYPE VOLUME LIMIT

This motion complies with this Court's October 7, 2020 Order setting a word limit for Petitioners' reply brief (Doc. #25) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments), this brief contains 5,164 words, which is fewer than one-half of the sum of the combined word totals of the responses filed by the federal respondents and the intervenor (10,334). This brief has been prepared in a proportionally spaced typeface using Microsoft Word for Mac 2019 in Times New Roman, 14 point.

/s/ Derek O. Teaney
DEREK O. TEANEY
APPALACHIAN MOUNTAIN ADVOCATES, INC.
P.O. Box 507
Lewisburg, WV 24901
Telephone:  (304) 646-1182
Email:        dteaney@appalmad.org

**CERTIFICATE OF SERVICE**

I hereby certify that, on October 12, 2020, I electronically filed the foregoing

with the Clerk of the Court for the United States Court of Appeals for the Fourth

Circuit by using the appellate CM/ECF system. The participants in the case are

registered CM/ECF users and service will be accomplished by the appellate

CM/ECF system.

/s/ Derek O. Teaney
DEREK O. TEANEY
APPALACHIAN MOUNTAIN ADVOCATES, INC.
P.O. Box 507
Lewisburg, WV 24901
Telephone:  (304) 646-1182
Email:        dteaney@appalmad.org